UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRIENDS OF THE DELAWARE RIVER LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CLEAN EARTH OF PHILADELPHIA, LLC,<br><br>Defendant. | **Civil No.: 2:26-cv-08664**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**<u>JURY TRIAL DEMAND</u>** |

Plaintiff, Friends of The Delaware River LLC ("Plaintiff"), by and through its counsel, alleges as follows:

1. This is a citizen suit, brought pursuant to the Section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Clean Earth of Philadelphia, LLC ("Clean Earth" or the "Defendant") arising out of operations at Clean Earth's facility located at 3201 South 61st Street, Philadelphia, PA 19153 (the "Facility").

2. Since at least April 9, 2021, Defendant has been discharging and continues to discharge polluted stormwater from the Facility in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, in violation of Pennsylvania's Clean Streams Law (the "CSL"), and in violation of the PAG-03 National Pollutant Discharge Elimination System ("NPDES") General Permit for Discharges of Stormwater Associated with Industrial Activity (the "General Permit") issued by the Commonwealth of Pennsylvania.

3. Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant's repeated and ongoing violations of the CWA.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5. On April 9, 2026, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided notice of intent to file suit against Defendant for CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region III; the Regional Administrator of the Pennsylvania Department of Environmental Protection ("DEP") Southeast Region; the Administrator of the DEP (collectively, "State and Federal Agencies"); and Defendant.

6. The Notice Letter provided Defendant with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendant violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the date, location, and person responsible for the violation(s), and (iv) the contact information for the Plaintiff and Plaintiff's Counsel. A copy of the Notice Letter is attached as Exhibit 1.

7. More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal Agencies. During this time, neither the EPA, nor the Commonwealth of Pennsylvania, has commenced or is diligently prosecuting a court action to redress the violations alleged herein. No claim in this action is barred by any prior administrative action pursuant to Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8. Venue is proper in the Eastern District of Pennsylvania pursuant to Section

505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

9. Plaintiff is an organization established to protect the watersheds located within the Southeast Region of the Commonwealth of Pennsylvania. Plaintiff and its members are concerned with the environmental health of the Schuylkill River and the Delaware River, and its members use and enjoy the waters of the Schuylkill River and the Delaware River, their inflows, outflows, and other areas of the overall Delaware River Watershed, into which the stormwater discharges from the Facility flow. Plaintiff's members use and enjoyment of these waters is negatively affected by the pollution caused by Defendant's operations. Plaintiff and its members are dedicated to protecting the water quality of the Schuylkill River and the Delaware River, and its members use and enjoy the waters of the Schuylkill River and the Delaware River, their inflows, outflows, and other areas of the overall Delaware River Watershed, for the benefit of its ecosystems and communities. To further these goals, Plaintiff actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and for its members and community.

10. Plaintiff's members, like other citizens, taxpayers, property owners, and residents of its community, lives, works, travels near, and recreates in close proximity to the confluence of the Schuylkill River and the Delaware River, and its members use and enjoy the waters of the Schuylkill River and Delaware River, its inflows, outflows, and other areas of the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part, into which Defendant discharges pollutants. Plaintiff's members, like other citizens, taxpayers, property owners, and residents, use and enjoy the Schuylkill River and the Delaware River, and its members use and enjoy the waters of the Schuylkill River and the Delaware River, their inflows, outflows,

and other areas of the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part, for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. Defendant's discharge of stormwater containing pollutants impairs each of these uses. Thus, Plaintiff's members' interests have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the General Permit.

11. Plaintiff's members have witnessed the polluted nature of the Schuylkill River and the Delaware River. Plaintiff's members have observed that the Schuylkill River and the Delaware River appear both brown and dirty. In addition to its visual observation of the water, Plaintiff's members have also noticed an unpleasant smell coming from the waters. For example, the President of FOTDR, is an avid jet skier. He, together with other FOTDR members, regularly traverse the Schuylkill River in and around the Facility as well as the Delaware River near its convergence with the Schuylkill River around the Philadelphia Navy Yard.

12. Plaintiff is aware that Defendant's Facility is upstream from where members utilize the Schuylkill River and the Delaware River near the Philadelphia Navy Yard and that the pollution from the Facility discharges into both the Schuylkill River and the City of Philadelphia MS4 storm drains, the Schuylkill River, the Delaware River, and the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part. Plaintiff believes that this has degraded the beauty of the Schuylkill River and the Delaware River, nearby parks, and curtailed its members' enjoyment of the adjacent area.

13. Plaintiff's members believe that reducing Defendant's pollution of the Schuylkill River and the Delaware River will improve the water quality in the Schuylkill River and the Delaware River and allow its members the opportunity to better enjoy the recreational and aesthetic interests in the Schuylkill River and the Delaware River, and the parks near to these waters.

14. Defendant is a Pennsylvania Corporation with its listed principal place of business

as 3201 South 61st Street, Philadelphia, PA 19153.

15. Defendant owns and operates the Facility.

16. The Facility operates as, amongst other things, a soil treatment and recycling facility. Other activities likely carried out in the regular course of business at the Facility include storage of fuel and other oils, maintenance, equipment storage, and waste storage. Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.




17. The Facility's industrial activities fall under the following Standard Industrial Classification ("SIC") Code 4359, refuse systems, requiring the Facility to obtain coverage under the General Permit. See, General Permit, Fact Sheet, PAG-03 Appendix § C, p. 3. Defendant applied for and received coverage under Pennsylvania's National Pollutant Discharge Elimination System's ("NPDES") PAG-03 General Industrial Stormwater Permit (Permit No. PAG030177) since at least 2023.[1]

[1] Prior to 2023, Clean Earth was covered under Permit No.: PAR900017.

## REGULATORY BACKGROUND

***The Problem of Stormwater Pollution***

18. Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of the Schuylkill River and the Delaware River, their tributaries, and the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part. With every rainfall event, significant amounts of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and into the Schuylkill River and the Delaware River, their tributaries, and the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part.

19. Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life. In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate plus nitrite nitrogen. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

20. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator/prey relationships (for example, turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact

species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

21. The CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated CWA requirements. Section 301(a), 33 U.S.C. § 1311(a) Among other things, CWA Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

22. The CWA requires that NPDES permits be issued for stormwater discharges "associated with industrial activity" to a point source. CWA Section 402(p), 33 U.S.C. § 1342(p).

23. The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

24. The CWA, Section 301(b), required that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

25. The Third Circuit has held that "a discharge that is not in compliance with a permit is archetypal Clean Water Act violation, and subjects the discharger to strict liability." *United States v. Pozsgai*, 999 F.2d 719, 725 (3d Cir. 1993); see *also United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 175 (3d Cir. 2004); *Natural Resources Defense Council, Inc. v. Loewengart & Co.*, 776 F. Supp. 996, 998 (M.D. Pa. 1991); *Public Interest Research Group v. Powell Duffryn Terminals Inc.*, 913 F.2d at 68, 73 n. 10 (3d Cir. 1990) ("the Clean Water Act imposes strict liability. All the plaintiff need do is establish that the defendant violated the terms of it NPDES

permit"); *Am. Canoe Assoc., Inc. v. Murphy Farms Inc.,* 412 F.3d 536, 539-40 (4th Cir. 2005) (declining to "graft an exemption onto the jurisdictional requirements of section 505(a) to shield from suit those past violators who have undertaken good-faith remedial efforts at the time of the complaint: and noting that "it is plainly possible for those undertaking good-faith remediation … nevertheless 'to be in violation' of the Act within the meaning of section 505(a), because the CWA creates a regime of strict liability for violations of its standards").

26. Pursuant to this strict liability regime, neither the CWA nor its implementing regulations contain an exception for "de minimis" violations. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979); *Hawaii's Thousand Friends v. City & Cty of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993) (noting that the CWA does not excuse de minimis violations).

27. CWA Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

28. CWA Section 505(a) authorizes a citizen suit action for injunctive relief. 33U.S.C. § 1365(a).

29. CWA violators are subject to an assessment of civil penalties of up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

***State Regulations***

30. CWA Section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA approved permit program for discharges. Pennsylvania was delegated the authority to administer the NPDES program in 1978.

31. In Pennsylvania, the DEP, through the Bureau of Clean Water ("BCW"), has

approval from the EPA to administer an NPDES permit program for the Commonwealth. The BCW issues general NPDES permits regulating water pollutant discharges from various categories of dischargers.

32. Pennsylvania law defines "pollution" as:

> contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The department shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.

*See* 35 P.S. § 601.1.

33. Pennsylvania law prohibits any person from placing or causing to be placed any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301; 35 P.S. § 691.611; 33 U.S.C. § 1311(a); *see also* 25 Pa. Code Chapters 92a, and 96.

34. Additionally, 25 Pa. Code § 92a.1(b) and 33 U.S.C. § 1342, prohibits any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant from a point source without applying for and obtaining a general or individual NPDES permit. *See* 25 Pa. Code § 92a.1(b); 33 U.S.C. § 1342.

35. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards ("WQS"), including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state WQS. *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §

122.44(d)(1).

36. Pennsylvania regulates water quality by way of a Water Quality Control Plan, which identifies WQS for water bodies within its geographic area. *See* 25 Pa. Code 93.6.

37. Specifically, WQS applicable to Defendant are set forth in Section 93.6 of the Pennsylvania Code. Section 93.6(a) of the Pennsylvania Code states: "Water may not contain substances attributable to point or nonpoint source discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life." *See* 25 Pa. Code 93.6(a).

38. In addition, Section 93.6(b) of the Pennsylvania Code states: "specific substances to be controlled include, but are not limited to, floating materials, oil, grease, scum and substances that produce color, tastes, odors, turbidity or settle to form deposits." *Id*. at 93.6(b).

39. Because the list of specific water quality criteria "does not include all possible substances that could cause pollution . . . [f]or substances not listed, the general criterion that these substances may not be inimical or injurious to the existing or designated water uses applies." *Id*. at 93.7(c).

***The General Permit***

40. Section 402 of the CWA establishes the NPDES program, which allows EPA and states acting under delegated authority to issue NPDES permits for the discharge of pollutants from a point source. 33 U.S.C. § 1342. Any person who discharges a pollutant must apply for a NPDES permit unless they are exempt under the statute or the EPA regulations implementing it. *See* 40 C.F.R. § 122.21(a).

41. The General Permit is an NPDES permit issued pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p). Violations of the General Permit are also violations of the CWA. *See* General Permit, Part B, § I(A).

42. The General Permit's Discharge Prohibitions prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. *See* General Permit, Part A, §§ I(B), I(C).

43. On or about March 24, 2023, the DEP adopted an updated NPDES General Permit for Discharges of Stormwater Associated with Industrial Activity. The changes made in the updated General Permit were adopted to be consistent with the United States EPA's Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP") that was reissued and updated in 2015. As of approximately March 24, 2023, the General Permit has superseded and rescinded the Previous PAG-03 General Permit except for purposes of enforcement actions brought pursuant to the prior permit.

44. The General Permit is intended to provide NPDES permit coverage for discharges of stormwater associated with industrial activity, as defined at 40 CFR § 122.26(b)(14) (excluding §§ 122.26(b)(14)(iii) for mineral industry, 122.26(b)(14)(ix) for sewage treatment works and 122.26(b)(14)(x) for stormwater associated with construction activity), and other industrial stormwater discharges that may be required to obtain a permit under Pennsylvania's Clean Streams Law.

45. Under the CWA and/or the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); General Permit, Part C, § II. The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

46. The Effluent Limitations of the General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of BMP specified at General Permit, Part C § II, and in the sector specific appendices to the General Permit, which are consistent with the sector specific effluent limitations contained in the EPA MSGP. These benchmark values are reiterated and incorporated into the General Permit. *See* General Permit, Appendices.

47. The General Permit requires dischargers to develop and implement an adequate Preparedness, Prevention and Contingency Plan (a "PPC Plan"). *See* General Permit, Part C, § IV. The General Permit also requires dischargers to review and if necessary, update the PPC Plan on an annual basis, at a minimum, and anytime a specific event triggers such a revision according to the General Permit. *See* General Permit, Part C, § IV(B).

48. The PPC Plan must include, among other requirements, the following: a description and assessment of all Clean Earth potential pollutant sources; a description of the BMPs that will reduce or prevent pollutants in stormwater discharges; responsive actions required to be taken in the event of a spill or other pollution incidents; identify areas of the facility in which, due to topography or other factors, have a high potential for soil erosion, and identify measures to limit such erosion; address security measures to prevent accidental or intentional entry which could result in an unintentional discharge of pollutants; a plan for training employees and contractors on pollution prevention, BMPs, and emergency response measures; include a site map that shows structures, impervious surfaces, control measures, receiving waters, stormwater conveyances, monitoring points, and non-stormwater discharge sites identify releases of "Water Priority Chemicals" within the previous three years; and, identify spill prevention control and countermeasure plans that may be used to meet the requirements of the General Permit. *See* General Permit, Part C, § IV(A).

49. The General Permit requires facility operators to develop and implement a Stormwater Self-Monitoring, Reporting and Recordkeeping Program. *See* General Permit, Part A § III, Part C § V. The General Permit requires that facility operators create and implement a Stormwater Self-Monitoring, Reporting and Recordkeeping Program to ensure that each of a facility's stormwater discharges comply with the Discharge Prohibitions and Effluent Limitations specified in the General Permit. Facility operators must ensure that their Stormwater Self-Monitoring, Reporting and Recordkeeping Program practices reduce or prevent pollutants in stormwater and authorized non-stormwater discharges as well as evaluate and revise their practices to meet changing conditions at the facility. *Id.* This may include revising the PPC Plan as required by General Permit, Part C, § IV(B).

50. The Stormwater Self-Monitoring, Reporting and Recordkeeping Program must measure the effectiveness of BMPs used to prevent or reduce pollutants in stormwater discharges, and facility operators must revise the Stormwater Self-Monitoring, Reporting and Recordkeeping Program whenever appropriate. *See* General Permit, Part A § III, Part C § V. The General Permit requires facility operators to monitor and collect samples of stormwater discharges from all outfall areas identified as such. *Id.* Facility operators are also required to provide an explanation of monitoring methods describing how a facility's monitoring program will satisfy these objectives. *Id.*

51. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

## STATEMENT OF FACTS

***Facility Description***

52. Plaintiff, through its counsel, has conducted a detailed investigation of the Facility operated by the Defendant at 3201 South 61st Street, Philadelphia, PA 19153.

53. The Facility is regulated by the PAG-03 General Industrial Stormwater Permit (the "PAG-03 Permit").

54. The Facility operates as a soil treatment and recycling facility, falls under Standard Industrial Classification ("SIC") 4953, and is therefore regulated by the PAG-03 Permit.

***Activities Resulting in Polluted Stormwater Runoff***

55. Operations at the Facility generally include, but are not limited to, soil treatment and recycling. Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties. Other activities likely carried out in the regular course of business at the Facility include storage of fuel and other oils, maintenance, equipment storage, and waste storage.

56. Certain operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

57. Specifically, Plaintiff's investigation has documented industrial processes at the Facility exposed to stormwater, including, but not limited to:

a. The storage of industrial machinery and products outdoors and not under cover, and exposed to stormwater, including:

    i. Raw Materials left uncovered and exposed to rainfall;

    ii. Piles of treated soil left uncovered and exposed to rainfall;

    iii. Piles of untreated soil left uncovered and exposed to rainfall;

iv. Piles of aggregate left uncovered and exposed to rainfall;

v. Dumpsters left uncovered and exposed to rainfall;

vi. Trucks left uncovered and exposed to rainfall;

vii. Hauling equipment left uncovered and exposed to rainfall;

viii. Metal equipment left uncovered and exposed to rainfall; and

ix. Refuse.

b. The carrying out of industrial processes outdoors and not under cover, including the use of the list of industrial machinery and products mentioned above.

58. Vehicles and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

59. The types of pollutants released by the Facility into the immediate environment are known to include, or have the potential to include, among other contaminants; Total Nitrogen, Total Phosphorus, pH, Total Suspended Solids ("TSS"), Chemical Oxygen Demand, Ammonia-Nitrogen, waste oils, lubricants, fuel, trash, debris, hazardous materials, heavy metals such as Total Iron, and other pollutants.

60. The industrial materials stored, and the pollutants generated at the Facility are exposed to stormwater flows.

61. Activities at the Facility generate significant debris and particulate matter, which contain pollutants that settle on surfaces within the Facility. During rain events, this pollution washes off those surfaces and flows via direct flow into both the Schuylkill River and the City of Philadelphia MS4 storm drains, which empties into the Schuylkill River and the Delaware River. The polluted stormwater discharges from the Facility, flows via direct flow into both the Schuylkill River and the City of Philadelphia MS4 storm drains, which empties into the Schuylkill River and the Delaware River, and the overall Delaware River Watershed, before eventually reaching the

Delaware Bay and the Atlantic Ocean.

***Activities Contributing to CWA Violations***

62. It is clear that Defendant has materially failed to comply with numerous aspects of the PAG-03 Permit, and as such, has been in constant violation of the PAG-03 Permit since at least April 9, 2021.

63. Defendant has not developed and/or implemented an adequate PPC Plan at the Facility.

64. Defendant has not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility.

65. Defendant has not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

66. Defendant has not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

67. Defendant has not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

68. Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards.

69. Defendant has not adequately evaluated and revised the Facility's PPC Plan to address these failures. Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the General Permit and its PPC Plan requirements.

70. Defendant has not developed and/or implemented an adequate Stormwater Self-Monitoring, Reporting and Recordkeeping Program at the Facility which has resulted in practices that do not adequately reduce or prevent pollutants from discharging from the stormwater flows

from the Facility.

71. Defendant's monitoring activities, or lack thereof, have not effectively identified compliance problems at the Facility or resulted in effective revisions of the PPC Plan.

72. Due to Defendant's lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. The potential pollutants from the Facility include among other contaminants; Total Nitrogen, Total Phosphorus, pH, Total Suspended Solids ("TSS"), Chemical Oxygen Demand, Ammonia-Nitrogen, waste oils, lubricants, fuel, trash, debris, hazardous materials, heavy metals such as Total Iron, and other pollutants. Stormwater from the Facility discharges, via the local storm sewer system and/or surface runoff, directly into the Schuylkill River, then into the Delaware River, and the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part.

73. Polluted stormwater is discharged from the Facility into both the Schuylkill River and the City of Philadelphia MS4 storm drains, and from there flows into the Schuylkill River, thereafter flowing further downstream into the Delaware River and the overall Delaware River Watershed, of which the Schuylkill River and the Delaware River are a part. The Schuylkill River and the Delaware River, their inflows and outflows, and other areas of the overall Delaware River Watershed are waters of the United States.

74. The issues at Defendant's Facility have persisted since at least April 9, 2021.

75. Specifically, in the six (6) month reporting periods reporting periods of January 1, 2026 through June 30, 2026; and July 1, 2022 through December 31, 2022, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Chemical Oxygen Demand

76. Specifically, in the six (6) month reporting periods reporting periods of July 1, 2025

through December 31, 2025; January 1, 2025 through June 30, 2025; July 1, 2024 through December 31, 2024; July 1, 2022 through December 31, 2022; and January 1, 2022 through June 30, 2022, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of TSS.

77. Pennsylvania regulates industrial stormwater discharges primarily through BMP-based stormwater control requirements implemented under the NPDES industrial stormwater program. Because the Permit's performance standard is tied to the adequacy of those controls rather than pollutant-specific numeric limits in every instance, technical guidance developed under EPA's national industrial stormwater program—such as MSGP benchmark development and sector BMP materials—can serve as a technical reference framework for evaluating whether a facility's controls are properly designed and effective, even though those MSGP provisions are not incorporated into PAG-03 as enforceable permit requirements.

78. The EPA's Mult-State General Permit ("MSGP"), sets benchmark values for numerous pollutant parameters Defendant is required to monitor, including but not limited to: (i) Total Nitrogen; (ii) Total Phosphorus; (iii) Ammonia-Nitrogen; and (iv) Total Iron.

79. The testing data submitted by Defendant reveals numerous instances in which the Facility discharges Total Nitrogen and Total Iron at levels that far exceed the values set forth in the EPA MSGP.

80. Specifically, in the six (6) month reporting periods reporting periods of January 1, 2026 through June 30, 2026; July 1, 2025 through December 31, 2025; January 1, 2025 through June 30, 2025; and July 1, 2024 through December 31, 2024, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Total Nitrogen.

81. Specifically, in the six (6) month reporting periods reporting periods of January 1, 2026 through June 30, 2026; July 1, 2025 through December 31, 2025; January 1, 2025 through

June 30, 2025; July 1, 2024 through December 31, 2024; July 1, 2022 through December 31, 2022; and January 1, 2022 through June 30, 2022, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Total Iron.

82. The exceedances set forth above are indicative of the Facility's failure to implement adequate BMPs to address it's the discharge of pollutants into waters of the United States such as the Schuylkill River and the Delaware River, their inflows and outflows, and other areas of the overall Delaware River Watershed.

83. Defendant has failed to implement BMPs that reduce or prevent discharges of pollutants in its stormwater discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

84. The Defendant has also violated the General Permit by failing to implement a PPC Plan that complies with the General Permit's requirements.

85. Significantly, the pollutants associated with SIC Code 4359 are particularly dangerous to riverine ecosystems, including: (i) Total Nitrogen; (ii) Total Phosphorus; (iii) pH; (iv) Total Suspended Solids ("TSS"); (v) Chemical Oxygen Demand; (vi) Ammonia-Nitrogen; and (vii) Total Iron. It is therefore clear that the numerous stormwater discharges from the Facility containing higher than allowable levels of these pollutants pose an immediate danger to the Delaware River Watershed.

86. Due to these numerous insufficiencies, discrepancies, and overages contained in the Defendant's annual stormwater sampling, the Facility's discharges of stormwater have been, and are likely to continue to be regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT and are thus violative the IGP and CWA.

**FIRST CAUSE OF ACTION**

**Discharges in Violation of the Permit Prohibitions of the General Permit**

**(Violations of 33 U.S.C. §§ 1211, 1342)**

87. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

88. The CWA and CSL prohibit any person from placing or causing to be placed, any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301; 35 P.S. § 691.611; 33 U.S.C. § 1311(a); *see also* 25 Pa. Code Chapters 92a, and 96.

89. The CWA and CSL prohibit any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant from a point source without applying for and obtaining a general or individual NPDES permit. *See* 25 Pa. Code § 92a.1(b); 33 U.S.C. § 1342.

90. Since at least April 9, 2021, Defendant has been discharging polluted stormwater from the Facility in violation of the Prohibitions of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, NoV at Attachment 3.

91. The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the Industrial Stormwater Permit.

92. Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the Industrial Stormwater Permit and the Water Quality Standards set forth in the Basin Plan.

93. Each day since at least April 9, 2021, that Defendant has discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and

distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

94. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365, and 35 P.S. § 691.602 and 605.

95. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm he has no plain, speedy, or adequate remedy at law.

96. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Effluent Limitations of the General Permit

97. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

98. The General Permit's PPC Plan requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

99. Defendant has discharged and continues to discharge stormwater from the Facility in concentrations above the level commensurate with the application of BMP specified at General Permit, Part C § II, and in the sector specific appendices to the General Permit, which are consistent with the sector specific effluent limitations contained in the EPA MSGP during every significant rain event occurring from April 9, 2021, through the present. Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions at the Facility is a violation of the General Permit and the CWA. *See* General Permit, Part C, § IV; 33 U.S.C. §

1311(b).

100. Each day since at least April 9, 2021, that Defendant has discharged stormwater containing pollutants in violation of the General Permit, specifically *General Permit, Appendices*, is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

101. Defendant's CWA violations described in the paragraphs above will continue in the future until Defendant develops and implements BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

102. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and 35 P.S. § 691.602 and 605.

103. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

104. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## THIRD CAUSE OF ACTION

### Failure to Develop and Implement an Adequate Preparedness, Prevention, and Contingency Plan, In Violation of the General Permit

105. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

106. The General Permit requires dischargers to develop and implement an adequate PPC Plan. *See* General Permit, Part C, § IV. The General Permit also requires dischargers to review and if necessary, update the PPC Plan on an annual basis, at a minimum, and anytime a

specific event triggers such a revision according to the General Permit. *See* General Permit, Part C, § IV(B).

107. Defendant, as of April 9, 2021, has commenced industrial activity and continues to conduct industrial activity at the Facility.

108. Defendant has failed and continues to fail to develop and implement an adequate PPC Plan or implement all necessary revisions to the PPC Plan for the Facility as required by the General Permit.

109. Defendant has failed and continues to fail to develop or implement a PPC Plan for the Facility that includes BMPs adequate to meet the requirements of the General Permit, specifically General Permit, Part C, § IV.

110. Defendant has failed and continues to fail to adequately develop or implement a PPC Plan at the Facility that prevents discharges from violating the Discharge Prohibitions, and Effluent Limitations of the General Permit.

111. Each day since April 9, 2021, that Defendant has failed to adequately develop and/or implement a PPC Plan for the Facility in violation of the General Permit, is a separate and distinct violation of CWA Section 301(a), 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

112. Defendant has been in violation of the General Permit's PPC Plan requirements every day since April 9, 2021. Defendant will continue to be in violation of the PPC Plan requirements each day that Defendant fails to develop and fully implement an adequate PPC Plan for the Facility.

113. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA Sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365, and 35 P.S. § 691.602 and 605.

114. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

115. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

### Failure to Develop and Implement Adequate Stormwater Monitoring and Recordkeeping, In Violation of the General Permit

116. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

117. Defendant has discharged and continues to discharge pollutants from the Facility in violation of the General Permit. Defendant is also in violation of the General Permit for repeated failure to report proper semiannual DMRs as required by the General Permit. Thus, Defendant's discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA Section 301(a), 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

118. Defendant has been in violation of CWA Section 301(a) every day it has discharged stormwater from the Facility to waters of the United States since April 9, 2021. Defendant will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the Facility to waters of the United States.

119. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and 35 P.S. § 691.602 and 605.

120. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. §

1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

121. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**RELIEF REQUESTED**

Plaintiff respectfully requests this Court to grant the following relief:

A. Declare Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the General Permit;

B. Enjoin Defendant from discharging pollutants from the Facility to stormwater discharge points, which discharge to the Schuylkill River and the Delaware River, and the overall Delaware River Watershed;

C. Order Defendant to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

D. Enjoin Defendant from violating Sections 301(a) and (b) and Section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the General Permit at the Facility;

E. Order Defendant to pay civil penalties of up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4;

F. Order Defendant to pay civil penalties of up to $10,000 per day for each violation of the Clean Streams Law. 35 P.S. § 691.602 and 605;

G. Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA Section 505(d), 33 U.S.C. § 1365(d);

H. Award such other relief as this Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: November 12, 2026

**BRODSKY SMITH**

By: Marc L. Ackerman

Evan J. Smith, Esquire (SBN 79032)
esmith@brodskysmith.com
Marc L. Ackerman, Esquire (SBN 56294)
mackerman@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 316350)
rcardona@brodskysmith.com
Two Bala Plaza, Ste. 805
Bala Cynwyd, PA 19004
Telephone: (610) 667-6200
Facsimile: (610) 667-9029

*Attorneys for Plaintiff*